IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SKI RACING INCORPORATED,

        Plaintiff,

v.                                                                                             No. 09-CV-1181 MCA/LAM

ALLEN JOHNSON dba JOHNSON
AND JOHNSON RACING,
aka JOHNSON & JOHNSON
RACING; and JOHNSON & JOHNSON
RACING, INC.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

       This matter comes before the Court upon Defendants' *Motion to Dismiss for Lack of Personal Jurisdiction and to Dismiss or Transfer for Improper Venue*. [Doc. 4] The Court has considered the parties' submissions, the applicable law, and is otherwise fully advised. For the reasons that follow, the Court concludes that it lacks personal jurisdiction over Defendants, and therefore **grants** Defendants' motion to dismiss.

**LEGAL STANDARDS**

       Johnson[1] has moved the Court pursuant to Fed. R. Civ. P. 12(b)(2) for dismissal of this action, asserting that he does not have constitutionally adequate contacts with New Mexico to

---

    [1]Defendant Johnson & Johnson Racing, Inc., is a defunct Tennessee corporation which was administratively dissolved in 1997, well before the transactions alleged in SKI's complaint. Since SKI bases its assertion of personal jurisdiction entirely on the conduct of Defendant Allen Johnson, for ease of reference the Court will refer to "Johnson," rather than "Defendants."

1

support this Court's assertion of personal jurisdiction[2] over him with respect to the claims asserted by SKI. In a case in which the Court's subject matter jurisdiction is founded on diversity of citizenship, 28 U.S.C. § 1332, whether an assertion of personal jurisdiction over a non-resident defendant is proper turns upon two showings: (1) that the long-arm statute of the forum state, in this case, NMSA 1978, § 38-1-16, authorizes service of process upon the defendant, and (2) that the assertion of personal jurisdiction comports with the due process clause of the Fourteenth Amendment. *Far West Capital v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995). A court's exercise of personal jurisdiction over a defendant in a diversity case comports with due process where (1) "there exist 'minimum contacts' between the defendant and the forum State" and (2) considering the defendant's contacts with the forum state, "maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Far West*, 46 F.3d at 1074 (citations and internal quotation marks omitted).

In conducting its personal jurisdiction analysis, the Court interprets and applies New Mexico's long-arm statute as would the New Mexico Supreme Court. *See Diamond Crystal Brands v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1258 (11th Cir. 2010) (applying Georgia long-arm statute). The New Mexico long-arm statute provides in pertinent part that:

> A.    Any person, whether or not a citizen or resident of this state, who is person or through an agent does any of the acts enumerated in this subsection thereby submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from:
> (1) the transaction of any business within this state;
> . . . .
> (3) the commission of a tortious act within this state[.]
> . . . .

---

[2] Personal jurisdiction may be either "general" or "specific." There is no dispute that if the Court has personal jurisdiction over Johnson, that jurisdiction is specific jurisdiction.

NMSA 1978, § 38-1-16.  Nominally, application of § 38-1-16(A) involves a three part test: "(1) Did the [defendant] commit an act or omission specifically set forth in the long-arm statute; Does [plaintiff's] cause of action arise out of the alleged acts or omissions; and (3) Has the [defendant] established sufficient minimum contacts with New Mexico to satisfy due process concerns?"  *Tercero v. Roman Catholic Diocese of Norwich*, 132 N.M. 312, 316 (2002). *Id.* at 316.  New Mexico appellate courts have held that § 38-1-16(A) "extends the jurisdictional reach of New Mexico Courts as far as constitutionally permissible," and that "the analysis of whether the [defendant] transacted business or committed a tortious act within New Mexico merges with the inquiry regarding whether such activities constitute minimum contacts sufficient to satisfy due process concerns."  *Id.* at 316.

**BACKGROUND**

The Court has elected to decide Johnson's motion to dismiss without conducting an evidentiary hearing. *See Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1069 (10th Cir. 2008) ("A district court has discretion to resolve [a Rule 12(b)(2)] motion in a variety of ways--including by reference to the complaint and affidavits, a pre-trial evidentiary hearing, or sometimes at trial itself.").  "Where there has been no evidentiary hearing, . . .and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists. " *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009) (internal quotations marks and citations omitted). "The 'well plead facts' of the complaint must be accepted as true, if uncontroverted by the defendant's affidavits, and factual disputes at this initial stage must be resolved in the plaintiff's

3

favor when the parties present conflicting affidavits." *Id.* (citations omitted; emphasis added).[3] "However, only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true." *Wentz v. Memory Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). Where the question of jurisdiction is resolved without an evidentiary hearing, a district court relying on documentary evidence may not weigh the evidence. *Ten Mile Indus. Park v. Western Plains Serv. Corp.*, 810 F.2d 1518, 1524 (10th Cir. 1987)  The Court will summarize the operative facts as determined by applying these standards to the record before the Court.

Plaintiff SKI Racing, Inc. ("SKI") is a New Mexico Corporation with an address in Artesia, New Mexico.[4] SKI's president is Johnny C. Gray.  The National Hot Rod Association's (NHRA's") official website states that Gray's hometown is Carlsbad, New Mexico. [Doc. 13-7] Defendant Johnson resides in Green County, Tennessee, [Doc. 4-2- at 1]doing business as Johnson and Johnson Racing. [Doc. 4-2 at 1; Doc. 12 at 2]  Defendant Johnson and Johnson Racing, Inc. is a defunct Tennessee corporation that was administratively dissolved in 1997, well prior to the events giving rise to this case.  [Doc. 4-2 at 2]  Johnson has never had an office in New Mexico; has never been licensed to do business in New Mexico; does not lease or own property in New Mexico; has never had a telephone listing in New Mexico; has never applied for

---

[3]"Of course, the question of personal jurisdiction can always be revisited at a post-pleading stage of the proceedings, where the evidence may show that the relevant facts are other than they have been pled. . . . And when personal jurisdiction is assessed at an evidentiary hearing or at trial, the plaintiff generally must substantiate his allegations with proof by a preponderance of the evidence." *Arocho v. Nafziger*, No. 09-1095, 2010 WL 681679 *5 (10th Cir. March 1, 2010) (unpublished order and judgment).

[4]It is not clear from the evidence before the Court whether, during time of the events alleged in the First Amended Complaint, SKI maintained an actual office or other physical presence at its Artesia address.

a loan or had a bank account in New Mexico; and has never directed any advertising into New Mexico. [Doc. 4-2 at 2-3]

SKI and Johnson compete in races held by the NHRA. SKI and Johnson compete in the same class and division of the NHRA. [Doc. 12 at 2, ¶ 4] In addition to competing in races, Johnson leases racing engines and provides services for his engines to other NHRA participants.[Doc. 12 at 2, ¶ 4] At a NHRA event in Dallas, Texas held between September 18-21, 2008, Johnson's father approached Shane Gray (apparently a relative of Johnny Gray) and mentioned that he "wished" that SKI would rent engines from Johnson and Johnson Racing. [Doc. 12-5 at 2, ¶ 3] Sometime during the approximately ten days between the Dallas event and September 29, 2008, Johnny Gray and Johnson met in Charlotte, North Carolina. [Doc. 4-2 at 3, ¶ 11] At that time Gray approached Johnson about leasing race-ready engines from Johnson for the 2009 and 2010 NHRA racing seasons. [Doc. 4-2 at 3, ¶ 11] Johnson and Gray negotiated the terms of a contract by which Johnson would furnish SKI with racing services and racing components, including engine and carburetor combinations. [Doc. 12 at 3, ¶ 14] On September 29, 2008, Johnson sent an e-mail to the e-mail address of Marbob Energy Corporation ("Marbob"), a business located in Artesia of which Gray is president and part owner. [Doc. 12 at 3] E-mails sent to the Marbob e-mail address were opened by a Marbob employee. [Doc. 12-3] In the September 29, 2008 e-mail, Johnson referred to "the deal as we spoke and agreed to." [Doc. 12-6] According to Johnson's e-mail, he and Gray had agreed that Gray's car was to "be tested and set up as needed to be compatible [sic] to Johnson and Johnson racing set up as near as can be accomplished." [Doc. 12-6] Johnson prepared a draft of a written contract, which he e-mailed to the Marbob e-mail address on October 16, 2008. [Doc. 12-7 at 1] The draft contract contained no signature lines and was post-dated to November 1, 2008. [Doc. 12-7 at 3] In an

5

accompanying e-mail, Johnson proposed that he and Gray sign the contract when he and Gray met in Las Vegas. [Doc. 12-7 at 1] Johnson and Gray executed the contract in Las Vegas, Nevada on October 31, 2008. [Doc. 4 at 2; Doc. 12-8]  The contract committed Johnson to provide SKI and Gray with race-ready engines for each 2009 and 2010 NHRA event, with personnel to service and maintain the engines, and with test engines, personnel and crew chief consulting as needed for testing.  [Doc. 12-8] In return, SKI agreed to pay Johnson $1,000,000 per year in $100,000 installments according to a schedule set out in the contract. [Doc. 12-8]

During the 2009 NHRA racing season (February 2009 through September 2009), Johnson provided engines and services to SKI. [Doc. 12-2 at 3, ¶ 12]  All of the NHRA events for which Johnson provided engines and services were held outside New Mexico. [Doc. 4-2 at 3, ¶¶ 13, 14] Johnson provided the services and equipment required by the contract at locations outside New Mexico. [Doc. 4-2 at 3, ¶¶ 13, 14] Johnson e-mailed invoices to Gray at the Marbob e-mail address.  [Doc. 12-9] Johnson spoke to Gray by telephone while Gray was in New Mexico to discuss the performance of Gray's car, the carburetor-engine combinations and other racing issues. [Doc. 12-2 at 2]  SKI made the payments required under the contract[5] by checks drawn on an account at an Artesia bank. [Doc 12-10] At each NHRA event during the 2009 racing season, Johnson and SKI were competitors. [Doc. 12-2 at 3, ¶ 13] During the first two-thirds of the 2009 season, SKI's car did not compete consistently with Johnson's car. [Doc. 12 at 6, ¶ 24] At fourteen of fifteen races held prior to August 2009, Johnson's car outperformed SKI's car. [Doc. 12-13] At an event in Denver Colorado, Johnson drove SKI's car, obtaining performance similar to that obtained by SKI's drivers. [Doc. 12-2 at 3, ¶ 16] Johnson clinched a

---

[5]The checks are made out to Defendant Johnson & Johnson Racing, *Inc.*, the defunct Tennessee corporation, rather than Johnson & Johnson Racing.

top spot in the NHRA rankings for the 2009 season. Thereafter, the performance of the carburetor-engine combinations provided by Johnson improved, performing as Johnson had represented they would. [Doc. 12-2 at 3, ¶ 17] The carburetor-engine combinations provided to SKI by Johnson prior to the time he clinched a top spot were not the "A" quality combinations that Johnson used in his own car. [Doc. 12-2 at 3, ¶ 18]

SKI did not make the initial $100,000 payment for the 2010 NHRA season required by the contract. [Doc. 12-2 at 4, ¶ 23] Instead, SKI filed the present lawsuit.

**DISCUSSION**

SKI's First Amended Complaint ("FAC") contains three counts: (1) breach of contract, pursuant to which SKI seeks rescission of the contract for the second year; (2) violation of the New Mexico Unfair Practices Act, NMSA 1978 §§ 57-12-1, *et seq.*, based on Johnson' alleged failure to deliver carburetor-engine combinations of a kind and quality of those utilized by Johnson as represented in the contract; and (3) negligent misrepresentation based upon Johnson's alleged misrepresentation of the nature and quality of carburetor-engine combinations to be provided to SKI. Personal jurisdiction is a "claim-specific inquiry." *Seiferth v. Helicopeteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006). Accordingly, the Court must analyze each claim to determine whether the requirements for personal jurisdiction are satisfied.

1.  **Count I**

    **Negotiations.** There is no dispute that contract negotiations were initiated outside New Mexico. SKI alleges that some contract negotiations were conducted by e-mail and telephone when Gray was in New Mexico. [Doc 12 at 2, ¶¶ 5, 8] Johnson specifically recalls in an affidavit attached to his motion to dismiss that the parties agreed upon the terms of their contract when they met in Charlotte, North Carolina. The only e-mail of record that might be considered part

7

of negotiations is the September 29, 2008 e-mail in which Johnson, in using the past tense (the "deal as we *spoke* and *agreed* to"), clearly is summarizing the results of *prior* negotiations and outlining terms of an oral agreement that had been reached *prior to* the September 29, 2008 e-mail.  In view of the proffered evidence of Johnson's clear recollection that he and Gray agreed to the terms of the contract at a meeting in Charlotte, North Carolina, Johnson's use of the past tense in his September 29, 2008 e-mail,  SKI's failure to document the specific substance of telephone conversations concerning negotiations or to introduce any additional e-mails reflecting negotiations,[6] and Gray's failure to directly contradict Johnson's specific recollection of when and where the contract was negotiated, the Court concludes that such evidence supports that the basic terms of the contract were settled prior to September 29, 2008, most likely when Johnson and Gray met in Charlotte, North Carolina.

**Execution of the Contract.**   When Johnson e-mailed a draft contract to Gray on October 16, 2008, the draft did not contain signature lines and was postdated to November 1, 2008, at which time Johnson expected that he and Gray would be in Las Vegas, Nevada.  Based on Johnson's uncontradicted recollection that he and Gray signed the contract in Las Vegas, Nevada, the Court finds that the contract was executed in Las Vegas, Nevada.

---

[6]The FAC alleges that Johnson "routinely" e-mailed Gray at the Marbob web address and that these e-mails "included contract negotiations."[Doc. 12 at 2, ¶ 8] In his affidavit, which is attached to the FAC, Gray states that "Allen Johnson routinely sent e-mail communications to my e-mail address in Artesia, New Mexico regarding issues related to the contract, such as billings and issues related to the Combination performance." [Doc. 12-2 at 2, ¶ 10] Significantly, Gray's affidavit does not refer to contract negotiations as constituting part of these routine e-mail communications. As noted above, the only e-mail that could be considered related to contract negotiations referred to in Johnson's affidavit is the September 29, 2008 e-mail.  The Court infers that the "routine"of e-mail communications referred to in the FAC could not have included contract negotiations.

**Performance/Breach of the Contract**. The contract obligated Johnson to provide engines, testing, and personnel to service and maintain the engines and to assist in testing. There is no language in the contract, there are no allegations in the FAC, and there is no evidence in the record suggesting that the parties understood or intended for any part of Johnson's performance to occur in New Mexico. The contract clearly contemplates that Johnson's performance will take place outside New Mexico. In his affidavit, Johnson states that all of the racing equipment provided under the contract was assembled and repaired at Johnson's machine shop in Greenville, Tennessee or at race locations located outside New Mexico, and that all the racing equipment and services provided under the contract were provided to Gray at Gray's crew chief's shop in Ohio or at NHRA races. Indeed, SKI itself recognizes that witnesses to Johnson's provision of equipment and services under the contract and the performance of SKI's car at NHRA events are located in various states other than New Mexico. [Doc. 12 at 6, ¶ 27]. Evidence proffered supports that in entering into their contract the parties understood and intended that Johnson's performance under the contract would take place entirely outside New Mexico. The proffered evidence also supports that Johnson's performance under the contract took place outside New Mexico. Further, it follows from the Court's conclusions that Johnson's performance took place entirely outside of New Mexico that the breaches of contract alleged by SKI necessarily occurred outside New Mexico, at the places where Johnson supplied allegedly non-conforming equipment and services.

*Burger King.* The principles governing the Court's personal jurisdiction analysis of Count I can be found in *Burger King Corp v. Rudewicz*, 471 U.S. 462 (1985). Like the present case, *Burger King* involved an interstate commercial dispute arising out of a contract to which the plaintiff and defendant were parties. *Burger King* establishes several crucial principles. First,

9

the fact that Johnson never physically entered New Mexico is not dispositive. *Id.* at 476. Second, the fact that Johnson entered into a contract with a New Mexico corporation does not automatically establish the requisite minimum contacts with New Mexico. *Id.* at 478-79. Rather, in deciding whether Johnson has minimum contacts with New Mexico, the Court must examine "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479.  Third, for the Court's exercise of jurisdiction to comport with due process, the Court must be satisfied that Johnson "purposefully avail[ed]" himself of the privilege of conducting activities within New Mexico, thereby "invoking the benefits and protections of its laws." *Id.* at 475 (quoting *Hanson v. Denkla*, 357 U.S. 235, 253 (1958); internal quotation marks omitted)).

       The Court's conclusions that the terms of the contract were negotiated in large part outside New Mexico, that the contract was executed outside of  New Mexico, that as contemplated by the contract Johnson performed his side of the contract at locations entirely outside New Mexico, and that any breaches by Johnson necessarily would have occurred outside New Mexico lead the Court to the conclusion that the contractual relationship between the parties clearly was centered in the various states in which the NHRA drag racing tour is conducted.  These states do not include New Mexico. The present case is clearly distinguishable from *Burger King*, where the plaintiff's principal place of business was located in the forum state, and as a result, much of the parties' interaction under the franchise agreement necessarily was centered in the forum state.

SKI's decision-making apparatus appears to have consisted of Gray and to have been located wherever Gray happened to be at a given point in time.  Johnson specifically recalled in his December 16, 2009 affidavit that "[m]ost of  my communications with Johnny Gray over the

10

previous fourteen (14) months concerning the performance of the Agreement have been in person since we have appeared on almost all of the same days at all of the NHRA sanctioned drag racing events for Pro Stock cars during that time." [Doc. 4-2 at 4, ¶ 18]  Because evidence proffered supports that all the NHRA sanctioned events took place outside New Mexico, the Court finds that most of the parties' interactions relating to the contract occurred outside of New Mexico.  Further, the contract between SKI and Johnson, unlike the franchise agreement in *Burger King*, does not state that the parties' relationship is located in a particular state.  The contract between SKI and Johnson, unlike the franchise agreement in *Burger King*, does not contain a choice of law clause, and therefore Johnson, by entering into the contract, did not expressly avail himself of the benefits and protection of New Mexico law. *Cf. Burger King*, 471 U.S. at 481-82  (discussing significance of choice-of-law  provision to purposeful availment inquiry). The contract between SKI and Johnson does not contain a forum selection clause, and accordingly, Johnson cannot be said to have consented to the jurisdiction of New Mexico courts by entering into the contract.  *Cf. id.* at 472 n.14 (discussing effect of "freely negotiated" forum selection clause).

      Although the undisputed evidence demonstrates that SKI paid Johnson by checks drawn on an Artesia, New Mexico bank, the Court finds SKI's unilateral decision to draw checks on a New Mexico bank to make the payments required under the contract to be "of negligible significance." *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 416-17 (1984). Lastly, the Court concludes that the phone conversations between Gray and Johnson and the e-mails Johnson sent to the Marbob e-mail address[7] are insufficient to make up for the lack of

---

[7]Johnson states in his affidavit that he assumed that Gray would receive many of the e-mails while traveling outside New Mexico on the NHRA tour. [Doc. 4-2 at 4, ¶ 17]  Although

other significant contacts between Johnson and New Mexico.  *See Far West*, 46 F.3d at 1076-77; *G & G Inn'l, LLC v. Camsing Co.*, No. 09-cv-00366-MSK-MEH, 2010 WL 466812 *2 (D. Colo. Feb. 9, 2010);   *CABA LLC v. Mustang Software, Inc.*, 127 N.M. 556, 563-64 (Ct. App. 1999).

Johnson did not purposefully avail himself of the privilege of conducting activities in New Mexico, nor can he be said to have invoked the benefits and protection of New Mexico's laws or courts at any time in his dealings with SKI.  Assertion of personal jurisdiction over Johnson with respect to Count I would not comport with due process.

**2.      Count II**

The Court construes Count II as asserting a claim under NMSA 1978, § 57-12-2(D)(17) (defining an unfair or deceptive trade practice as "failure to deliver the quality . . .of goods contracted for"):  "Johnson made representation that the Combination to be provided would be of a like kind and quality as those being utilized by Johnson. . . . Johnson *failed to deliver* Combinations to SKI that were of a like, kind and quality to those being used by Johnson. . . . Johnson's *failure to deliver* the Combinations as represented violates the [NMUPA]"  [Doc. 12 at 7, ¶¶ 34, 35, 36 (emphasis added)]  SKI argues that long-arm jurisdictions exists pursuant to

---

Marbob employee Misti McLurg states in an affidavit that "[i]t is my understanding that Allen Johnson always knew the e-mails were received  by me rather than Johnny Gray," her affidavit does not demonstrate how this statement is based on  personal knowledge. Fed. R. Evid. 602. As the First Circuit Court of Appeals has observed, the ability of a recipient to open an e-mail anywhere in the world may distinguish e-mail from traditional mail, communication via a landline telephone, or face-to-face contact for purposes of personal jurisdiction analysis. *Phillips v. Prairie Eye Center*, 530 F.3d 22, 28 n.3 (1st Cir. 2008);  *see also Kern v. Jackson*, No. 4:08cv436, 2009 WL 1809973 *4 (E.D.Tex. June 25, 2009) (observing that contacts via cell-phone or e-mail "have increasingly been viewed as less convincing indicators of purposeful availment of a particular forum in light of the mobility permitted with both forms of communication").

§ 38-1-16(A)(3). [Doc. 13 at 8] The Court will assume, without deciding, that the cause of action created by the NMUPA is a species of statutory tort,[8] and therefore, that a violation of the NMUPA can constitute the "commission of a tortious act" for purposes of § 38-1-16(A)(3).  *Cf. Lyle Richards Int'l , Ltd. v. Ashworth, Inc.*, 1323 F.3d 111, 114 (1st Cir. 1997)(assuming, but not deciding, that an unfair trade practices claim alleges "tortious injury" for purposes of  provision of Massachusetts long-arm statute granting jurisdiction over a "cause of action . . . arising from [a defendant's] causing tortious injury by an act or omission in [Massachusetts]").

In the context of a tort claim, the appropriate inquiry for purposes of minimum contacts analysis is whether the defendant "purposefully directed its activities at the forum state." *Dudnikov*, 514 F.3d at 1071.  Although SKI is a New Mexico corporation, its business is centered upon the NHRA tour, which consists of racing events held outside New Mexico, and Johnson's business relationship with SKI likewise is centered upon the NHRA.  The contract between SKI and Johnson clearly contemplated that Johnson's performance under the contract would take place outside New Mexico.  Because Johnson delivered the contracted-for goods and services outside New Mexico, any failure to deliver contracted-for goods or services on the part of Johnson necessarily took place outside New Mexico.  Further, the direct adverse consequences to SKI--the poor performance of its cars at NHRA events–occurred outside New Mexico.  The Court finds that the states in which Johnson delivered allegedly non-conforming goods and services were the focal points of any injury suffered by SKI.  *See Dudnikov*, 5145

---

[8]A violation of § 57-12-2(D)(17)  is not established merely by the defendant's delivery of non-conforming goods or services.  Subsection 57-12-2(D) incorporates a requirement that the defendant have committed the deceptive conduct "knowingly."  This mens rea requirement adds to  the tortious character of  a NMUPA violation, and serves to distinguish a NMUPA claim from a mere breach of contract.

13

F.3d at 1074-75 (discussing *Calder v. Jones*, 465 U.S. 783 (1984); defining "focal point" of an intentional tort as the place where the harm is actually felt by the plaintiff); s*ee also IMO Industries v. Kiekert, AG*, 155 F.3d 254, 261-63 (3d Cir. at 1998) (analyzing cases from other circuits; concluding that "[t]hese cases cast doubt on the assertion that a company will feel the 'brunt' of a tort injury at its principal place of business when that injury is based on damage to contracts or property not centered in the forum"). The Court further finds that because SKI's business is centered on the NHRA tour, Johnson's alleged violations of the NMUPA should be deemed to have been aimed at the states in which the allegedly non-conforming goods and services allowed Johnson's car to outperform SKI's car at NHRA events. FAC, ¶ 37 [Doc. 12 at 8 ("Johnson's failure to deliver the represented Combinations was . . . done . . .for the purpose of enhancing Johnson's economic position and its NHRA competitor standings to the detriment of SKI and its standings.").

SKI's decision to make payments using a New Mexico bank is "of negligible significance," and is properly viewed as SKI's unilateral activity. *Helicopteros Nacionales*, *supra*. Any incidental economic effects that SKI experienced in New Mexico from Johnson's failure to deliver the contracted-for goods and services are insufficient to establish minimum contacts. *See Far West*, 46 F.3d at 1080; *see also DeVenzeio* v. *Rucker, Clarkson & McCashin*, 121 N.M. 807, 811 (Ct. App. 1996) (holding economic loss experienced by New Mexico residents as a result of California attorney's alleged malpractice in California litigation insufficient to establish commission of a tort in New Mexico by California attorney; observing that exercise of jurisdiction by New Mexico courts "would offend traditional notions of fair play and substantial justice, and would amount to a denial of [defendant's] right of due process" ).

The Court finds that Johnson did not purposefully direct its activities at New Mexico. Assertion of personal jurisdiction over Johnson with respect to Count II would not comport with due process.

### 3.     Count III

Count III asserts a claim for negligent misrepresentation. SKI alleges that it relied on Johnson's representations in deciding to enter into a contract with Johnson. [Doc. 12 at 8, ¶ 41] SKI argues that in applying § 38-1-16(A)(3), New Mexico courts rely on the place-of-the-wrong rule, and that under the place-of-the-wrong rule, the situs of the tort of negligent misrepresentation tort for purposes of § 38-1-16(A)(3) is New Mexico, where SKI drew checks on a New Mexico bank to make payments required by the contract. [Doc. 13 at 12] The Court agrees that New Mexico applies the place-of-the-wrong rule in determining whether a tortious act has been committed in New Mexico. *Roberts v. Piper Aircraft Corp.*, 100 N.M. 363, 366 (Ct. App. 1983). Under the place-of-the-wrong rule as adopted in *Roberts*, the place of the wrong is where the "last event takes place which is necessary to render the [defendant] liable." *Id.* (quoting *Gray v. Amer. Radiator & Standard Sanitary Corp.*, 176 N.E.2d 761 (Ill. 1961)). SKI has overlooked *Swindle v. General Motors Acceptance Corp.*, 101 N.M. 126 (Ct. App. 1984). *Swindle* held that for purposes of long-arm jurisdiction, the last act necessary to render a defendant liable for fraudulent inducement to enter into a contract occurs when the plaintiff relies on the defendant's misrepresentation by signing the contract. *Id.* at 128 (observing that non-resident defendant became liable for fraud when plaintiff relied on misrepresentation by signing contract). Under *Swindle*'s application of the place-of-the-wrong rule to the long-arm statute, the place where the plaintiff signed the contract is the situs of the tort of fraudulent inducement. *Id.* (concluding that defendant's liability arose in Ohio, where plaintiff signed

15

contract).  Applying *Swindle*, the Court finds that the last act necessary to complete the tort of negligent misrepresentation[9] occurred in Las Vegas, Nevada, when, in reliance on the alleged misrepresentations, SKI entered into the contract with Johnson, incurring the legal obligation to make the payments required by the contract.  *Swindle*, 101 N.M. at 128.  Under the place-of-the-wrong rule, Johnson was not guilty of the commission of a tort within New Mexico as required by § 38-1-16(A)(3), and therefore SKI has not satisfied the first prong of the personal jurisdiction analysis outlined in *Far West*.  Because SKI has not satisfied *Far West*'s first, state-law prong, the Court need not proceed to the second, federal-law prong.

**CONCLUSION**

SKI has failed to establish that the Court's assertion of personal jurisdiction over Defendant with respect to Counts I and II comports with due process.  SKI has failed to establish that New Mexico's long-arm statute authorizes the assertion of personal jurisdiction over Defendant with respect to Count III.

**WHEREFORE**,

**IT IS HEREBY ORDERED** that Defendants' *Motion to Dismiss for Lack of Personal Jurisdiction and to Dismiss or Transfer for Improper Venue*  [Doc. 4] is **granted**, and that the First Amended Complaint and this action are **dismissed without prejudice** for want of personal jurisdiction.

**SO ORDERED** this 31st day of July, 2010.

M. CHRISTINA ARMIJO
UNITED STATES DISTRICT JUDGE

---

[9]As with fraud, reliance is an element of negligent misrepresentation.  *Compare* NMRA 13-1632 *with* 13-1633.